[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 8, 2008
THOMAS K. KAHN
CLERK

No. 07-14898
_____

D. C. Docket No. 01-01392-CV-J-25MCR

ELOY RENTERIA-MARIN,
SIMON GALINDO-HILARIO, et al.,

Plaintiffs-Appellees,

versus

AG-MART PRODUCE, INC.,
GREEN STRIPE, INC.,

Defendants-Appellants.

D. C. Docket No. 02-CV-627-J-25MCR

MARINO PEREZ-ALVINO
ANTONIO APOLINAR, et al.,

Plaintiffs-Appellees,

versus

AG-MART PRODUCE, INC.,
GREEN STRIPE, INC.,

Defendants-Appellants.

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 8, 2008)**

Before CARNES and MARCUS, Circuit Judges, and DuBOSE,[*] District Judge.

DuBOSE, District Judge:

I.   OVERVIEW

Appellees, migrant farm workers ("workers"), brought this class action

against Ag-Mart Produce, Inc. and Green Stripe, Inc.[1] ("Ag-Mart") under the

Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") 29 U.S.C. §

1801 *et seq. ,* alleging that because Ag-Mart *controlled* the workers' housing, Ag-

Mart was required to ensure that the housing met AWPA standards and was

certified compliant.  Appellees also allege that because Ag-Mart *provided* housing

to the workers, Ag-Mart is liable for failing to provide statutorily required notices

to the workers.

After conducting a bench trial the district court determined that Ag-Mart

*controlled* and *provided* the housing to the workers, thus Ag-Mart was liable for

_____

[*]Honorable Kristi K. DuBose, United States District Judge for the Southern District of Alabama, sitting by designation.

[1]Ag-Mart is owned by defendant Green Stripe, Inc.

failing to comply with AWPA's housing provisions. For the reasons explained herein, we hold that the district court erred in its determination that Ag-Mart "controlled" the housing within the meaning of the AWPA. However, we affirm the district judge's determination that Ag-Mart "provided" housing. Accordingly, we remand this action to the district court for a determination of the proper damage award based on Ag-Mart's violation of the AWPA notice requirements.

## II. FACTS[2]

Ag-Mart is a major producer of grape tomatoes. In 2001 and 2002, approximately 500-600 harvest workers were recruited and transported to the Jennings, Florida area by farm labor contractors or "crew leaders " to harvest tomatoes on Ag-Mart's north Florida farm. Due to the short-term nature of the job and the fact that limited housing was available, crew leaders customarily procured housing for the workers. The crew leaders were paid a commission based on the harvest. The crew leaders were not compensated for time spent performing housing duties.

Ag-Mart contracted with Ajay Gandhi ("Gandhi"), the owner of a Motel 8 in nearby Jasper, Florida, to provide rooms for the workers. Gandhi, through his

---

[2] These are the facts as determined by the district court. We do not find them to be clearly erroneous.

company CKG Group, Inc., in turn contracted with Hospitality Investments for additional rooms for the workers at Howard Johnson and Best Western. Gandhi negotiated reduced daily room rates ($26) with the motels and then billed Ag-Mart at a higher rate ($35.95) for each room. The crew leaders would contact Mr. Gandhi directly to arrange for the necessary number of rooms for their workers. During the harvest season, Ag-Mart workers constituted a substantial majority of the guests at all three motels.

The motel rooms were typically registered under the names of the crew leaders and/or Gandhi. The room keys were issued to the crew leaders who in turn made the room assignments and decided which worker would have responsibility for the room key. The crew leader generally collected $25 per week in rent from each worker. If less than $100 per week was collected per room, Ag-Mart recouped the resulting shortfall from the crew leader. The remainder of the charge for each room, which was the majority of the room charge, was subsidized by Ag-Mart.

The crew leaders were directed by the farm manager to assign no more than four people to each room, which was the occupancy limit set by Howard Johnson

and Best Western.[3] However, in order to build a "cushion" against rent collection shortfalls, some crew leaders assigned five or more workers to a room, forcing some of the workers to sleep on the floor.

The motels were not equipped with sufficient laundry facilities for the workers. Moreover, there were generally no cooking facilities and many Ag-Mart employees did not have regular access to a refrigerator. As a result, workers purchased their meals from mobile food wagons set up in the parking lots of the motels. Workers often paid $18 per day for meals, considerably more than if they had access to kitchen facilities.

The motel management generally afforded the crew leaders full access to the workers' rooms. While Ag-Mart did not promulgate any of the motel's occupancy rules, the crew leaders helped enforce the motels' rules and policies including: (1) monitoring occupancy levels in each room, (2) enforcing curfew, (3) requiring workers to place their shoes outside of their rooms, so that dirt would not be tracked into the rooms, (4) monitoring workers' use of outside gas grills, (5) removing excessive amounts of trash accumulated at the motels and (6) restricting

_____

[3] Three double beds were placed in the rooms at the Motel 8, while each room at the Howard Johnson and the Best Western had two double beds. It was not uncommon for workers to be assigned to share a motel room with non-family members of the opposite sex, with all of them using common toilet and shower facilities.

5

excessive noise. At least one of the motels required the crew leaders to execute a hotel waiver delineating their responsibilities for the behavior of their crew members. In addition, some crew leaders were given "in house crew sheets" containing a daily room count that the hotel relied upon for its administrative billing process.

In a written disclosure Ag-Mart prepared for distribution to the workers, it was noted that the hotel rent would be $25 per week. While this notice was generally distributed to the workers, at least one crew leader conceded that he did not deliver this written disclosure to his workers. Moreover, during the 2001 and 2002 harvest seasons, Ag-Mart did not post in a conspicuous place at the motels or present to its employees a written statement of the terms and conditions of occupancy of the motels.

### III. STANDARD OF REVIEW

We review factual findings made by a district court after a bench trial for clear error, which is a highly deferential standard of review. Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1350 (11th Cir. 2005); Fed. R. Civ. P. 52(a). We review conclusions of law made by a district judge following a bench trial *de novo.* Thornburg v. Gingles, 478 U.S. 30, 79, 106 S. Ct. 2752, 2781(1986) (quoting Bose Corp. v. Consumers Union, 466 U.S. 485, 501, 104 S. Ct. 1949,

6

1960(1984)) (Review for clear error "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.").   Thus, the district court's interpretation of the terms "controlled" and "provided" as used in AWPA is reviewed *de novo*. *See* Morante-Navarro v. T&Y Pine Straw, Inc., 350 F.3d 1163, 1166 (11th Cir. 2003) (Whether Plaintiffs' raking, gathering, baling, and loading of pine straw for commercial sale is "agricultural employment" within the purview of the AWPA concerns a question of law and is reviewed *de novo*.)

## IV.   DISCUSSION

In construing a statute, "[o]ur ultimate goal is to give effect to congressional intent." Morante- Navarro 350 F.3d at 1166 (quoting Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1505 (11th Cir.1993) (construing the AWPA)). We are primarily guided in our statutory analysis of the AWPA by the plain meaning of the statute's language, counseled by the Department of Labor's interpretations.  Morante-Navarro, 350 F.3d at 1166 (citing Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1505 (11th Cir. 1993)); see also  Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782(1984) ("[C]onsiderable weight should be accorded to an executive

department's construction of a statutory scheme it is entrusted to administer and the principle of deference to administrative interpretations.") If the statute's language is not plain, we rely on the legislative history of the AWPA. United States v. Fields, 500 F.3d 1327, 1330 (11th Cir. 2007) ("In the absence of any plain meaning of the statutory language, we look to the legislative history of the statute to determine whether Congress provided any guidance concerning its intent.").

The precedent act to AWPA was "the Farm Labor Contractor Registration Act of 1963, codified as amended at 7 U.S.C. § 2041 et seq. ("FLCRA")(repealed 1983). "The FLCRA was the first major federal effort to improve the conditions for agricultural laborers . . . ." Morante-Navarro, 350 F.3d at 1168. "In 1982, Congress substituted the AWPA for the FLCRA because the FLCRA had failed to aid exploited agricultural laborers, yet was hampering agricultural employers with its onerous registration requirements." Id. at 1169 (citation omitted). The AWPA was an effort "to remove the restraints on commerce caused by activities detrimental to migrant and seasonal agricultural workers; to require farm labor contractors to register under this Act; and to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers." 29 C.F.R. § 500.1(a) (2008). We have recognized that "AWPA is a remedial statute and should be construed broadly to effect its

humanitarian purpose." Caro-Galvan, 993 F.2d at 1505; Morante-Navarro, 350 F.3d at 1166.

At issue in this case are two provisions of the AWPA which address protections related to migrant workers' housing. The first provision requires each person who owns or *controls* a facility that is used as housing for migrant farm workers, to ensure that the facility complies with federal and state health and safety standards and to post the certification of compliance at the site. 29 U.S.C. §1823 (a)- (b)(1). Also at issue is a provision that requires that each farm labor contractor, agricultural employer or agricultural association which *provides* housing to migrant farm workers post or present to such worker a statement of the terms and conditions of the occupancy. 29 U.S.C. § 1821(c).

*A. Agency*

Before we delve into the statutory interpretation of these provisions of the AWPA, we must address the threshold issue of whether the crew leaders were acting as Ag-Mart's agents in the procurement of housing.[4] The establishment of an agency relationship requires: "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3)

---

[4] The plaintiffs did not argue that Gandhi and CKG Group, Inc. were agents of Ag-Mart.

9

control by the principal over the actions of the agent." Whetstone Candy Co., Inc. v. Kraft Foods, Inc., 351 F.3d 1067, 1077 (11th Cir. 2003).

We agree with the district court that the facts establish that an agency relationship existed between Ag-Mart and the crew leaders in regard to housing the workers. Ag-Mart contracted for the housing at the motels and authorized the crew leaders to make arrangements through Gandhi for their workers to reside at the motels. Ag-Mart then directed the crew leaders to collect the rent from the workers and held the crew leaders responsible for any shortfall. Ag-Mart's north Florida farm manager directed the crew leaders to assign four employees to each motel room, advised at least one crew leader that completion of the in-house crew sheets was part of his job responsibilities and occasionally mediated disputes regarding the motels. The crew leaders generally accepted and performed Ag-Mart's directives regarding worker housing, thus forming an agency relationship between Ag-Mart and the crew leaders.

*B. Controls a Facility*

Next we consider whether Ag-Mart, or Ag-Mart acting through the crew leaders, exerted the necessary control over the housing facility to make Ag-Mart subject to 29 U.S.C. § 1823. 29 U.S.C. § 1823 addresses compliance with federal and state safety and health standards and provides that "each person who owns or

10

controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing." 29 U.S.C. § 1823(a). The statute also requires the person who owns or controls the facility or property to post a compliance certification at the site. 29 U.S.C. § 1823(b)(1). The Department of Labor's (DOL) implementing regulations define "controls" as being *"in charge of or ha[ving] the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee. . . . "* 29 C.F.R. § 500.130(c).

The workers urge the court to interpret the phrase "person who owns or controls a facility" to include a person who oversees, manages or supervises the occupants of the facility. The fallacy in the workers' urged interpretation of "controls a facility" is that it is contrary to the plain language of the statute. "[W]hen the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms." Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S. Ct. 1942, 1947 (2000) (citations and internal quotations omitted). *See also*, H.R. Rep. No. 97-885, at 13 (1982), *reprinted in* 1982 U.S.C.C.A.N.

4547, 4559 ("The committee intends that the language of . . . the . . . protections provided by this Act, be given their plain meaning."). The statute clearly refers to a person who owns or controls the *facility*, not a person who controls the occupants of the facility. Controlling the occupants does not equate to controlling the facility. The court cannot amend the statute through interpretation. It is for Congress to amend the statute if they intended to cover persons who control only the occupants. See Lamie v. United States Tr., 540 U.S. 526, 542, 124 S .Ct. 1023, 1034 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent . . . . This allows both of our branches to adhere to our respected, and respective, constitutional roles.")

That is not to say that the ability to control a facility does not have as a component certain controls over the occupants. As seen in this case, the motels set rules for the occupants, which were generally enforced by the crew leaders, concerning safety, cleanliness and noise restriction. However, having control over a facility, as contemplated by Congress, entails significantly more than controlling its occupants. This determination is borne out in the purpose of 29 U.S.C. § 1823(a).

29 U.S.C. § 1823(a) was enacted to ensure that a facility used to house

12

migrant workers meets applicable safety and health standards. The DOL explains that the substantive safety and health standards referenced include "those that provide fire prevention, an adequate and sanitary supply of water, plumbing maintenance, structurally sound construction of buildings, effective maintenance of those buildings, provision of adequate heat as weather conditions require, and reasonable protections for inhabitants from insects and rodents." 29 C.F.R. § 500.133. In addition to the foregoing concerns, federal regulations also address, *inter alia,* the location of the facility, the size and content of sleeping facilities and the necessary provisions for laundry and food preparation. 29 C.F.R. § 1910.142.[5]

A person who only controls the occupants and not the physical facility could not directly effectuate the maintenance of, *inter alia*, plumbing, electricity, sanitation, fire safety equipment and cleanliness in compliance with applicable federal and state standards. *Cf*. Charles v. Burton, 169 F.3d 1322, 1333 (11th Cir. 1999) ("[A] business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."). Moreover, if a person is to comply with other federal regulatory directives which relate to the construction of the facility,

---

[5]These regulations are applicable to facilities used as temporary labor camps. We have previously noted that "[r]egardless of the type of facility, where the units are grouped for two or more families, they are commonly called camps." Caro-Galvan 993 F.2d at 1510 (quoting President's Comm'n on Migratory Labor, Migratory Labor in American Agriculture 138 (1951)).

13

e.g., sleeping room size, provision for laundry and food preparation facilities, the person must obviously have power or authority to control the physical facility.

There is nothing in the record to suggest that Ag-mart had any control over the motel facilities such that Ag-Mart could directly ensure compliance with the applicable health and safety standards. Neither Ag-Mart nor the crew leaders were authorized to repair or maintain any of the physical facilities at the motels. It is not disputed that each of the motels employed its own maintenance and housekeeping staff to repair and clean the motels on a daily basis. Moreover, neither Ag-Mart nor the crew leader were authorized to remodel or reconstruct the facilities. In order to comply with federal standards for temporary migrant work camps, the motels would have been required to be remodeled, at least to the extent to provide adequate laundry and food preparation facilities.[6]

Congress could certainly expand the number of people responsible for ensuring compliance with federal and state health and safety standards applicable to migrant work camps. In fact, when Congress enacted the AWPA and expanded protections afforded to agriculture workers, they made a policy decision that

---

[6]The court notes that although inapplicable in this case because the defendants are not innkeepers, Congress has specifically exempted from coverage of 29 U.S.C. §1823, "any person who, in the ordinary course of that person's business, regularly provides housing on a commercial basis to the general public and who provides housing to migrant agricultural workers of the same character and on the same or comparable terms and conditions as is provided to the general public." 29 U.S.C. §1823(c).

14

compliance with housing notice provisions should be expanded from those who controlled the housing facility to include those who provided housing. Specifically, the precedent act to AWPA, the FLCRA, provided that "[e]very farm labor contractor shall- (d) in the event he manages, supervises, or otherwise *controls the housing facilities*, post in a conspicuous place the terms and conditions of occupancy. . . . " 7 U.S.C. § 2045(d) (emphasis added) (repealed 1983). The AWPA expanded this provision to cover "[e]ach farm labor contractor, agricultural employer, and agricultural association which *provides housing* for any migrant agricultural worker shall post in a conspicuous place or present to such worker a statement of the terms and conditions, if any, of occupancy of such housing." 29 USC §1821(c) (emphasis added). The legislative history of the AWPA indicates that Congress intended that the use of the term "provides housing" to be inclusive of those who procure housing. H.R. Rep. No. 97-885, at 15 (1982), *reprinted in* U.S.C.C.A.N. 4547, 4561 ("The use of the term [provides] includes, but is not limited to situations where an entity makes housing available to workers, procures housing for the worker's use, or furnishes housing."). Thus it is apparent that if Congress had intended to apply the requirements of 29 U.S.C. §1823(a) to those who only procure housing for migrant workers, they would have used the more comprehensive phrase "provides

housing" rather than "controls a facility or real property which is used as housing."

In making its determination that Ag-Mart controlled the facility for purposes of AWPA, the district court focused on the following facts: (1) the motel rooms were registered either under the names of the crew leaders or Gandhi; (2) room keys were issued to the crew leaders who in turn made the room assignments; (3) crew leaders determined which worker would have responsibility for the room key; (4) crew leaders collected weekly rent from the employees; (5) crew leaders monitored occupancy levels in each room; (6) crew leaders assisted the motel in enforcing occupancy rules. We find that these facts are insufficient to establish control of the facility by Ag-Mart or its crew leaders such that Ag-Mart can be held liable under the AWPA for certification violations pursuant to 29 U.S.C. § 1823.

*C. Provides Housing*

We next address the issue of whether Ag-Mart "provided" housing to the migrant workers such that it can be held liable for failing to post the required housing information.[7] As previously stated, 29 U.S.C. § 1821(c) provides that

---

[7] The information to be contained in the notices is outlined in 29 C.F.R 500.75(f):

(f) Each farm labor contractor, agricultural employer and agricultural association *which provides housing* for any migrant agricultural worker shall post in a conspicuous place (at the site of the housing) or present in the form of a written statement to the worker the following information on the terms and conditions of

"[e]ach farm labor contractor, agricultural employer, and agricultural association which *provides housing* for any migrant agricultural worker shall post in a conspicuous place or present to such worker a statement of the terms and conditions, if any, of occupancy of such housing." The district court reasoned that the term "provides" is broader than the term "controls" under the statute and therefore an employer could violate the posting requirement without "controlling" the housing. We agree. As explained above, Congress intended that §1821(c) encompass an agricultural employer who procures housing for its employees. The evidence establishes that Ag-Mart contracted with Gandhi to provide the housing,

---

occupancy of such housing, if any:

(1) The name and address of the farm labor contractor, agricultural employer or agricultural association providing the housing;

(2) The name and address of the individual in charge of the housing;

(3) The mailing address and phone number where persons living in the housing facility may be reached;

(4) Who may live at the housing facility;

(5) The charges to be made for housing;

(6) The meals to be provided and the charges to be made for them;

(7) The charges for utilities; and

(8) Any other charges or conditions of occupancy.

subsidized the housing and authorized its crew leaders to oversee the workers. Based on these facts, we find that Ag-Mart "provided" housing to the workers within the meaning of the AWPA .

Moreover, the district court's factual finding that the required notice was not posted or presented as required is not clearly erroneous. Ag-Mart does not contest that they did not post the required notice or present the workers with a statement of all of the required information. Rather, Ag-Mart argues that the workers were notified that there was a $25 weekly charge to reside in a local motel and that the workers were "aware" of the additional information that is required to be included in the notice. This argument is without merit as the regulations clearly require that the additional information be included in a written statement. 29 C.F.R § 500.75(f).

## V. CONCLUSION

We REVERSE the district court on its determination that Ag-Mart is liable under 29 U.S.C. § 1823 and REMAND for entry of judgment consistent with this opinion. We AFFIRM the district court's determination that Ag-Mart violated 29 U.S.C. § 1821(c) and REMAND for a determination of damages.