[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11541

_____

D.C. Docket No. 1:15-cv-00949-SCJ

AMERICAN GUARANTEE & LIABILITY INSURANCE COMPANY,

Plaintiff - Appellee,

versus

LIBERTY SURPLUS INSURANCE CORPORATION,

Defendant - Appellant,

ACE PROPERTY AND CASUALTY INSURANCE COMPANY,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 9, 2020)

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM and LUCK, Circuit
Judges.

PER CURIAM:

Liberty Surplus Insurance Corporation was the primary insurance carrier for an apartment complex in Sandy Springs, Georgia. Ten years ago, a tenant in that complex walked into his apartment and encountered a gas explosion when he entered the door. Over the next five years, adjusters and attorneys representing a "tower" of primary and excess insurers worked to defend the complex and its management against the injured tenant's state-court lawsuit.

On the eve of trial, the defense team estimated their worst verdict at $1.5 million. But the jury, instead, returned a $72.96 million verdict, a combination of special damages, pain and suffering, punitive damages, and attorney's fees. The parties ultimately settled for $15 million, spawning a federal-court proceeding—this case—to determine priority among the insurers for paying the liability. As part of that case, excess insurer American Guarantee & Liability Insurance Company cross-claimed against Liberty for negligently failing to settle the state-court lawsuit.

After American Guarantee prevailed at a bench trial, Liberty appealed. Now, on appeal, Liberty disagrees with the district court's analysis of the failure-to-settle claim, contends that it was entitled to a safe harbor under Georgia law for tendering its limits to an excess insurer, and argues that American Guarantee could not prevail under the doctrine of equitable subrogation.

2

Upon careful consideration and with the benefit of oral argument, for the reasons set forth below, we affirm.

## I.

## A.

As of 2010, Edgewater Apartments was an apartment complex in Sandy Springs, Georgia, that was owned by Aslan Commons, LLC, and managed by WSE, LLC. On May 31, 2010, an explosion occurred in unit 1703, causing tenant Stephen D. Wells to suffer first-, second-, and third-degree burns over more than half his body.

At the time of the explosion, Aslan and WSE collectively held five liability insurance policies. The following insurers issued these policies, with their respective per-occurrence limits: Liberty, as Aslan's primary insurer ($1 million); ACE Property & Casualty Insurance Co., as Aslan's excess insurer ($10 million); AXIS Insurance Co., as one of WSE's two primary insurers ($1 million); First Specialty Insurance Co., as WSE's other primary insurer ($1 million); and American Guarantee, as WSE's excess insurer ($20 million). Liberty received notice of the explosion on June 2, 2010, and opened a claim.

Nearly two years later, on April 6, 2012, Wells filed suit against Aslan and WSE. We refer to that as the *Wells* litigation. The complaint in *Wells* alleged that Edgewater had failed to cap the dryer gas line in Wells's apartment, as required by

3

fire and gas codes, and that failure caused the explosion. The complaint further averred that Wells's medical expenses were likely to exceed $250,000. Wells brought various counts of negligence—such as negligent maintenance, negligent hiring, negligent training, and negligent inspection—and sought punitive damages.

As required under the insurance policy, Liberty retained counsel to defend Aslan and WSE in the *Wells* litigation. In July 2012, defense counsel relayed the findings of a post-explosion investigation, which had determined that dryer gas lines were not capped in 57 out of 609 units at Edgewater. One of those uncapped lines was in unit 1703. Defense counsel speculated that Wells himself may have opened the valve on his gas line.

In a February 2013 update, defense counsel summarized evidence that established Aslan's and WSE's liability. For example, one witness suggested that the complex responded improperly to a complaint of a gas odor shortly before the explosion. In addition, although a maintenance supervisor knew that dryer gas lines needed to be capped, he admitted that nobody inspected for caps. Wells stated that he had manipulated the valve on only the water heater, which was located apart from the gas dryer and, unlike the dryer valve, could be opened without a wrench. The report valued Wells's medical expenses at between $218,000 and approximately $250,000 and estimated his property damages as $26,525. It also noted that he was seeking damages for pain and suffering. n a supplemental report sent on February

4

15, 2013, defense counsel expressed concerns about a strategy that would blame local inspectors or other officials.

On about March 19, 2013, Wells's attorney sent defense counsel a settlement demand, extending a thirty-day offer to settle for $5 million. With this letter, Liberty's adjuster also received a copy of a "Day in the Life" video, which depicted Wells's treatments to remove his burned tissues. Liberty's adjuster found that the treatment appeared very painful to endure and that the video was "somewhat troubling to watch."

ACE and American Guarantee received notice of the *Wells* lawsuit on April 23 and April 25, 2013, respectively. Both carriers assigned adjusters to handle the case. American Guarantee began to monitor the litigation through AXIS and its coverage counsel. By May 2013, defense counsel was sending updates to the entire "team"—representatives from Liberty, ACE, AXIS, WSE, and Aslan.

The parties to the *Wells* litigation met for mediation on April 26, 2013. In response to Wells's demand for $5 million, Liberty offered $50,000, and Wells lowered his demand to $4.95 million. Liberty was the only insurer that attended the mediation, and Wells's attorney expressed surprise that no excess carriers went. The mediation ended without a settlement, and Wells's counsel indicated that he would not negotiate further until Liberty offered its $1 million policy limit. In a follow-up letter, Wells's attorney requested that defense counsel place its insured clients (Aslan

and WSE) and the excess insurers in a position to sue the primary insurer (Liberty) upon entry of an excess verdict, so that Wells would be able to collect on any verdict after trial.

After the mediation, ACE's adjuster noted that Wells refused to settle for under $1 million. She also recorded in her claim notes that "we have a good defense theory—which is that plaintiff opened the gas cap himself." In a June 2013 status report, defense counsel indicated another potential strategy—assigning blame to outside inspectors for not reporting the code violations. The report, however, noted the weaknesses in this defense. Defense counsel concluded that "it is fathomable that the amount of fault allocated to Wells, if any, will be negligible." In the report, defense counsel reported no significant increase in estimated damages but noted that Wells had recently begun seeing a mental health professional for post-traumatic stress disorder ("PTSD").

On October 24, 2013, defense counsel informed the team about a recent conversation with Wells's attorney. In that conversation, Wells's attorney said that if the defense offered $1 million, Wells would drop his demand from $5 million to $3 million. As a result of this conversation, defense counsel thought that while Wells might settle for less than $2 million, "he does seem hung-up on getting at least $1 million."

ACE's adjuster wrote in a claim note dated December 12, 2013, that Wells's counsel would not engage in further mediation until Liberty put up its $1 million limit for settlement discussions. ACE's adjuster further noted that neither she nor Liberty wanted to make such an offer, and that she thought the claim was valued under $1 million. In a claim note dated March 17, 2014, ACE's adjuster described Wells's condition as "not bad": he had "completely recovered" and had "no support" for his claims of erectile dysfunction or PTSD. The claim note underscored that Defendants had good evidence to show comparative negligence—that Wells was more than half at fault—because Wells told first responders "that he tried to close the water heater." The report again noted that Liberty estimated the settlement value of the claim at under $1 million.

On April 21, 2014, defense counsel sent the team an email, informing them that Wells had quit his job teaching because of his emotional condition. Defense counsel noted that Wells might have a claim for diminished earning capacity. The email also informed the team that Wells had begun seeing doctors to treat PTSD. As a result, defense counsel indicated the possibility that his damages might increase.

By the end of July 2014, defense counsel informed the team that the state court had resolved all dispositive motions, so there was "nothing standing in the way of a trial setting." The letter also described some liability as "inevitable" for WSE: the code required gas lines to be capped, the gas lines were not capped, and caps would

7

have prevented the explosion. The letter summarized a two-part defense strategy: portraying WSE as having acted reasonably and assigning fault to Wells for turning on the gas. However, the letter acknowledged concerns with these strategies. With respect to the first part, WSE would likely be found liable even if jurors believed it acted reasonably. As for the second, there was no direct evidence that Wells turned on the gas, and defense counsel thought it "extremely unlikely" that a jury would find Wells more than 50% at fault. Nevertheless, defense counsel reported that "there is a fair chance that Plaintiff will share some fault."

The July 24 letter also analyzed Wells's damages. Defense counsel described the "Day in the Life" video depicting Wells's burn treatment as "quite graphic" and commented that it "will make a strong impression of how painful Plaintiff's injuries were in the weeks following the explosion." Defense counsel also described Wells's "very emotionally fragile" demeanor at a recent deposition as convincing. In light of this evidence and the fact that Wells would also be pursuing damages for lost wages, the letter concluded with an increased estimate for the verdict—between $1.25 million and $1.5 million.

After receiving this letter, ACE's adjuster wrote in her claim notes that she still did not think the settlement value for Wells's claim was above $1 million. However, Liberty's adjuster said in a deposition that she understood the letter to

contain some unfavorable developments, such that the settlement value "may have changed slightly."

During a conference call on November 6, 2014, a representative from WSE expressed concern about the possibility of an excess verdict and reputational harm to its business. The representative said that WSE wanted the case to be settled.

Liberty authorized up to $250,000 for a settlement, and defense counsel extended a $240,000 offer to Wells. Noting that Wells faced medical liens, his attorney rejected this offer as a "non-starter". He reiterated that Wells would lower his prior demand to $3 million if defendants offered $1 million. As a result, defense counsel surmised that $2 million would settle the case.

Defense counsel sent the team a pre-trial report on November 18, 2014. This report repeated earlier conclusions that some liability was inevitable for WSE. It also recapped defendants' trial strategy, including the risks of blaming Wells. Regarding damages, the report estimated Wells's then-current medical expenses at $225,000, his property damages at $20,000, and his lost wages at $17,000 per year. It also anticipated a "substantial" award for pain and suffering and suggested, based on Wells's demeanor at his last deposition, that the jury would readily believe his testimony regarding the emotional impact of the explosion. However, defense counsel did not consider Wells's claim for punitive damages and "bad faith" attorney's fees to be a significant threat.

9

The November 18 report concluded by summarizing counsel's valuation of the claim:

> Our valuation has not changed since our last pre-trial report in July. At that time, we stated that a verdict in the range of $1.25 and $1.5 million was likely. Of course, it is possible that a verdict on either side of this estimate might be returned as well. Along these lines, it has been noted that our defense in this case turns on accusing Plaintiff of lying and malingering. Such a tactic carries substantial risk. If the jury does not believe the Defendants' side of the story, they may infer the Defendants are lying (or at least take umbrage with the Defendants for "blaming the victim"). Inflamed juries are hard to predict, but such a scenario would carry with it the chance of a verdict well in excess of our range.

In a footnote to the second sentence of this paragraph, counsel wrote, "In team discussions with the client and the insurers, our concerns that the likely verdict range would surpass the primary layer of insurance were noted."

Beginning in early December 2014, and into the first half of January, the parties negotiated over the brackets within which they might settle. The parties used these brackets, which they also called "high-low agreements," for two functions: to negotiate a final settlement value and to limit the range of the jury's verdict if the case went to trial. Wells had offered a bracket of $1 million/$3 million, to which Liberty counteroffered with a proposal of $400,000/$900,000. Wells responded to that offer with a proposal of $900,000/$9 million. In response, ACE and Liberty proposed $250,000/$1.2 million. Wells then responded with a proposal of

$800,000/$8 million. ACE authorized a follow-up offer of $350,000/$1.25 million. But by that point, on the eve of trial, Wells's counsel had ended the negotiations.

On January 7, 2015, WSE's counsel sent a letter to defense counsel, demanding again that the *Wells* litigation be settled for an amount within the aggregate policy limits. The letter noted "the prospect of reputational harm to WSE, LLC and affiliates by a public trial and a substantial verdict." In support of this possibility, the letter pointed to "the facts as to liability, the amount of the medicals, and the graphic nature of the treatment and injuries." The letter also represented that the head of WSE did not believe that "the insurers have negotiated in good faith in an effort to settle this lawsuit." In support of this claim, the letter noted that Liberty's previous settlement offers would not even cover Wells's medical expenses. It described $2 million as a reasonable settlement amount. The letter concluded by urging defense counsel to forward the letter to the insurers.

On January 8, 2015, a Liberty supervisor wrote in the claim notes that their adjuster had been given permission "to make our limit available to the excess carrier pending correspondence from them requesting it." He added, "It is unlikely that this will settle short of trial. If tried, he'll attempt a hi/low with $500,000 as the low."

The court held a pretrial hearing on Friday, January 9. After the hearing, Liberty's adjuster wrote to his colleague that the excess insurers had not asked for

11

his limits or tried to settle the case. He noted that defense counsel would contact the excess insurers' counsel "to reiterate our strategy."

On Saturday, January 10, one of Liberty's adjusters, Thomas Cooper, emailed his colleagues, recommending that Liberty make its limits available to the excess insurers for settlement purposes. He also explained that he had been in touch with ACE's counsel, who would not be sending a "hammer letter"[1] because the January 7 letter from WSE was "sufficient for [Liberty] to make [its] limits available." His colleague replied the next day, noting that she "thought we already agreed that we would tell the excess carrier that our limit was available for settlement purposes[.]"

Cooper emailed his Liberty colleagues again on Sunday, January 11, to convey that defense counsel had also recommended that Liberty provide its limits to ACE. That day, he told defense counsel that Liberty would make its limits available to ACE. Defense counsel informed ACE's counsel that Liberty was "making its limits available for any settlement discussions." He added, "If anyone wants to still discuss a high/low they [Liberty] are offering $500,000 on the low."

That same day, ACE's adjuster called Wells's counsel regarding settlement. Wells's counsel said he was not interested in anything less than $3 million. ACE's

---

[1] According to ACE's adjuster, a "hammer letter" serves to encourage an insurer to settle within its limits.

adjuster told him that she might be able to offer a little in addition to Liberty's $1 million, "but in no way it will be close to $3 [million]."

Trial began the week of January 12, 2015. During jury selection, defense counsel showed potential jurors a clip from the "Day in the Life" video. The attorney whom ACE had hired to monitor the proceedings wrote in a report that "Plaintiff's attorney did a masterful job of questioning each juror about events and experiences in their own lives which he then related to factual issues in the case." That day, Wells's attorney again demanded $3 million for settlement, but stated that a slight discount could be made.

The attorneys delivered their opening statements on Tuesday, January 13. After Wells testified on direct examination, his attorney showed the eight-minute-long "Day in the Life" video, depicting the care he received during his burn treatment. After playing that video, Wells's attorney increased his settlement demand to $5 million. Cooper, who attended trial on behalf of Liberty, learned of these demands from either ACE's adjuster or defense counsel. He wrote in Liberty's claim notes that the video and Wells's testimony appeared to have a significant impact on the jurors.

On January 14, 2015, Wells continued to present witnesses. In his daily report, ACE's monitoring counsel wrote that this "testimony further solidified the likelihood of a significant verdict for the Plaintiff in that the majority of the

testimony focused on the lack of training of the maintenance personnel in regard to gas dryer lines and general policies and procedures."

On the last day of trial, Cooper emailed his Liberty colleagues to ask if he could commit the insurer's $1 million limit towards a high-low agreement. He explained, "If closings go today I don't want to impede a high low settlement." But after they conferred, Cooper emailed defense counsel, informing him that the low figure could be no higher than $500,000. Liberty's $1 million limit, he wrote, is "for settlement purposes only." Cooper asked defense counsel to contact him or his colleague if Wells extended another high-low offer, and he said they would consider it. At some point that day, Wells's attorney proposed a high-low agreement of $3 million/$11 million. In her deposition, ACE's adjuster stated that because Liberty would not contribute more than $500,000 on the low figure, there was nothing ACE could do in response to this proposal.

After defendants' unsuccessful motions for directed verdict and both sides' closing arguments, defendants extended a settlement offer of $1.25 million prior to jury deliberation. Wells rejected that offer without countering. The jury began deliberations shortly after 1:30 p.m.

The jury returned a verdict that afternoon. Finding defendants 100% at fault, the jury awarded $17.9 million in compensatory damages, plus attorney's fees and punitive damages. Based on additional testimony heard after the initial verdict, the

14

jury awarded attorney's fees in the amount of $7.16 million and punitive damages of $47.9 million.  The verdict therefore totaled $72.96 million.

The parties filed various post-trial motions.  Defendants moved to reduce the punitive damage award pursuant to a $250,000 cap under Georgia law.  *See* Ga. Code Ann. § 51-12-5.1(g).  Wells contended that the statute was unconstitutional.  The court applied the $250,000 cap and entered judgment for approximately $25.87 million, which included prejudgment interest, on February 3, 2015.  However, the judge stated during the hearing that he found the constitutional challenge, in the words of defense counsel, "very compelling."

Later that month, Wells's counsel wrote to the insurers and demanded payment of the judgment by March 10, 2015.  If the insurers did not pay the judgment by that date, Wells would appeal to have the cap on punitive damages declared unconstitutional.

At that point, American Guarantee took over settlement negotiations.  The other insurers tendered their respective policy limits, totaling $13 million, so that American Guarantee could settle the lawsuit.  At a mediation held on August 17, 2015, American Guarantee settled the lawsuit for $15 million.

**B.**

On April 1, 2015, ACE filed a complaint in the Northern District of Georgia under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  ACE sought to

15

resolve the priority of coverage among the insurers, in addition to other issues. The complaint named the other insurers, Aslan, WSE, and Wells as defendants, with the latter three included as only nominal parties. ACE later voluntarily dismissed First Specialty and AXIS.

With its answer, American Guarantee filed a counterclaim against ACE and a cross-claim against Liberty. These claims alleged that Liberty and ACE had negligently failed to settle the *Wells* suit. The claims further alleged that under the doctrine of equitable subrogation, Liberty and ACE were liable to American Guarantee for the $2 million that American Guarantee contributed to the $15 million settlement of the *Wells* case.

The parties filed cross-motions for summary judgment on American Guarantee's negligence claims; ACE and American Guarantee—the excess insurers—also moved for summary judgment on the priority-of-coverage claim. The district court held that fact issues precluded summary judgment on American Guarantee's negligence claim and denied the cross-motions accordingly. In the same opinion, the court resolved the priority-of-coverage claim in the following order: (1) Liberty, with responsibility up to $1 million; (2) ACE, with responsibility from $1 million to $11 million; (3) AXIS and First Specialty, with concurrent responsibility from $11 million to $13 million; and (4) American Guarantee, with responsibility from $13 million to $33 million. Finally, the court directed the clerk

to amend the case caption to reflect that American Guarantee would be the plaintiff at trial.

In July 2018, American Guarantee settled with ACE, leaving American Guarantee's cross-claim against Liberty as the sole remaining claim for trial. The parties agreed that American Guarantee's claims would be tried to the court.

On August 20, 2018, the district court held a bench trial on American Guarantee's claim against Liberty. American Guarantee did not present any witnesses but offered joint documentary exhibits and deposition transcripts. Liberty called one witness at trial, an assistant vice president of casualty claims who had a role in overseeing the handling of the *Wells* case.

On September 25, 2018, the district court issued its findings of fact and conclusions of law. The court found, by a preponderance of the evidence, that Liberty had been negligent in exposing the insured parties to an unreasonable risk of an excess verdict. In reaching this conclusion, the court pointed to Liberty's failure to offer its limits until the day before trial and its insistence on a $500,000 limit for the low figure of any high-low agreement, even after Liberty had offered its limits for settlement. The court underscored that by July 2014, Liberty knew that the jury would return a verdict for Wells in an amount that would likely exceed its own limit, that Wells would not accept a settlement below $1 million, that special damages

were over \$437,000, and that there were considerable weaknesses in defense counsel's two-pronged strategy.

The court also decided that, for two reasons, Liberty was not entitled to a safe harbor recognized under Georgia law for insurers that tender their limits in response to an opportunity to settle. First, the court found that Liberty's offering of its limit was conditional and that this condition on the use of Liberty's limit was unreasonable. Second, the court determined that Liberty's delay in offering its limit was too late for the safe harbor to apply.

The district court therefore found in favor of American Guarantee. The court had previously required American Guarantee to file its settlement agreement with ACE under seal. Because American Guarantee recovered \$400,000 through its settlement with ACE, the court awarded American Guarantee \$1.6 million from Liberty—that is, the rest of the amount that American Guarantee had contributed towards final settlement in the *Wells* case. The clerk entered judgment on September 25, 2018.

## C.

On October 19, 2018, Liberty filed a motion to alter or amend the judgment under Rule 59 of the Federal Rules of Civil Procedure. Liberty argued the following: (1) it could not be held liable on a failure-to-settle theory of negligence because the insured parties were never subject to a judgment in excess of the policy limits;

18

(2) American Guarantee had acted inequitably and thus was not entitled to equitable subrogation; (3) Liberty was entitled to the safe harbor for tendering its limits; (4) Liberty had not proximately caused any damage to the insured parties; and (5) Liberty had not breached the standard of care. On March 14, Liberty moved to supplement its briefing on the Rule 59 motion in light of the Georgia Supreme Court's recent decision in *First Acceptance Insurance Company of Georgia, Inc. v. Hughes*, 826 S.E.2d 71 (Ga. 2019).

On March 29, the court granted Liberty's motion to supplement but denied the Rule 59 motion on the merits. The court observed that Liberty had raised these same arguments prior to and at trial and noted that Liberty's argument about proximate cause was implicitly addressed in the court's findings and conclusions. The court also stated that its earlier order was consistent with *Hughes*.

Liberty timely appealed to this Court on April 22, 2019.

## II.

Following a bench trial, we review the district court's conclusions of law de novo and its findings of fact for clear error. *Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1201 (11th Cir. 2016). As part of our de novo review, we correct errors of law, including misapplications of law to fact and factual findings predicated on legal errors. *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008). We will not disturb findings of fact for which there exists substantial

19

evidence in the record. *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007). But we will correct clear errors in the district court's factual findings when we are "left with the definite and firm conviction that a mistake has been committed" after reviewing the entire record. *Sidman*, 841 F.3d at 1201 (quoting *Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1320 (11th Cir. 2011)).

## III.

Under Georgia law, an insurer may be liable to a policyholder when it acts with negligence, fraud, or bad faith in failing to settle a claim against its insured. *S. Gen. Ins. Co. v. Holt*, 416 S.E.2d 274, 276 (Ga. 1992). And in cases like this one, involving a tower of multiple insurers, an excess insurer may bring a failure-to-settle claim against the primary insurer under the doctrine of equitable subrogation. *See Evanston Ins. Co. v. Stonewall Surplus Lines Ins. Co.*, 111 F.3d 852, 858 (11th Cir. 1997).

On appeal, Liberty raises three challenges to the district court's findings and conclusions. First, Liberty argues that American Guarantee did not establish several elements of a failure-to-settle claim. Second, Liberty contends that by offering its $1 million limit for settlement, it is entitled to a safe harbor from liability. Third, it asserts that American Guarantee cannot prevail under the doctrine of equitable subrogation because the insured parties themselves could not prevail on this claim. We discuss these issues in turn.

20

A. <u>The district court did not reversibly err in analyzing the failure-to-settle claim.</u>

Georgia law imposes a duty on insurers to respond reasonably when they receive offers to settle claims within their policyholders' limits. *See Holt*, 416 S.E.2d at 276. Satisfying this duty is based on the standard of the ordinarily prudent insurer. *Cotton States Mut. Ins. Co. v. Brightman*, 580 S.E.2d 519, 521 (Ga. 2003). If an insurer breaches this duty, it may be liable for a verdict that exceeds the policy limits. *See McCall v. Allstate Ins. Co.*, 310 S.E.2d 513, 514–15 (Ga. 1984).

The rationale behind failure-to-settle claims is preventing insurers from gambling with the funds of their insured by unreasonably taking cases to trial. *See id.* at 515. When insurers receive offers to settle for the limits of their policies, their interests diverge from those of their policyholders. *Brightman*, 580 S.E.2d at 521. Compared to paying out the policy limits, the insurer faces no risk in taking the case to trial, where the insured policyholder will be responsible for paying any excess judgment. *Id.*

With that explanation in mind, we turn to Liberty's arguments. Liberty first contends that the district court erred in analyzing the failure-to-settle claim because there was no duty, excess judgment against the insured parties, or proximate cause.

21

*1.  Liberty owed a duty to its insured.*

Liberty argues that it owed no duty to settle the *Wells* case.  This issue presents a question of law.  *See Norfolk S. Ry. Co. v. Zeagler*, 748 S.E.2d 846, 851 (Ga. 2013).  Accordingly, we review it de novo.  *See Sidman*, 841 F.3d at 1201.[2]

A failure-to-settle claim, which sounds in tort, includes three elements:  duty, breach, and proximate cause.  *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1546–47 (11th Cir. 1991).  As to duty, Georgia law was long unclear whether an insurer needed to receive an offer to settle within the policy limits to trigger a duty.  *E.g.*, *id.* at 1544.  In *Delancy*, we noted the possibility that an insurer could still owe a duty without receiving a settlement offer, if settlement within the policy limits was possible and the insurer knew or reasonably should have known of that fact.  *See id.* at 1548–51.  However, in *Hughes*, the Supreme Court of Georgia recently clarified that an offer within the insured's policy limits is a prerequisite for the insurer to owe a duty to settle.  *Hughes*, 826 S.E.2d at 75.

Although the decision in *Hughes* came after the district court issued its findings and conclusions in this case, the district court rejected Liberty's motion to

---

[2] Neither party argues that we should apply the abuse-of-discretion standard for review of motions to alter or amend the judgment under Rule 59 of the Federal Rules of Civil Procedure.  *See Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc.*, 763 F.2d 1237, 1238–39 (11th Cir. 1985).  Because the decision in *Hughes* is likely retroactive and therefore controls our review of the district court's original conclusions of law, in any case, *see Findley v. Findley*, 629 S.E.2d 222, 228 (Ga. 2006), we conclude that the standard of review is not dispositive of our resolution of this issue.

alter or amend its judgment in light of *Hughes.* The district court reasoned that its earlier conclusions of law were consistent with *Hughes*. In that earlier order, the district court found that Wells demanded $3 million on the first day of trial and raised this demand to $5 million after showing the "Day in the Life" video to the jury. The district court noted that an "insurer must '[act] reasonably in responding to a settlement offer,'" *Baker v. Huff*, 747 S.E.2d 1, 6 (Ga. Ct. App. 2013) (alteration in original) (quoting *Fortner v. Grange Mut. Ins. Co.*, 686 S.E.2d 93, 94 (Ga. 2009)), and concluded that Liberty acted unreasonably by placing restrictions on the use of its funds.

Under Georgia law, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1373 (11th Cir. 2005) (citation omitted). Here, we conclude that Wells's $3 million and $5 million demands during trial were valid offers to settle, sufficient to trigger Liberty's duty to its insured. *See Hughes*, 826 S.E.2d at 75.[3]

Liberty does not dispute that these demands were valid offers to settle. Rather, it contends that they came too late—after Liberty provided its limits to ACE for

---

[3] The district court's order containing its findings and conclusions from the bench trial was issued before *Hughes* and concludes that Liberty owed a duty even before it received a settlement demand. While *Hughes* shows that was not correct, we may affirm on any basis in the record, even one on which the district court did not rely. *Henley v. Payne*, 945 F.3d 1320, 1333 (11th Cir. 2019).

settlement purposes. But Liberty's analysis conflates the issues of duty and breach. Even if Liberty had tendered its limits to ACE, that fact would not answer whether it was under a legal obligation—a duty—to do so. *See Norfolk S. Ry.*, 748 S.E.2d at 851–52. Instead, whether Liberty tendered its limits to ACE would be relevant to the ensuing issue of breach. *See Fortner*, 686 S.E.2d at 95.

Liberty also suggests that its duty required an offer to settle within its own policy limits ($1 million), instead of the total limits of its insured ($33 million). But the Supreme Court of Georgia has explained that an offer must be within the *insured's* policy limits to trigger an insurer's duty. *Hughes*, 826 S.E.2d at 73. This rule is consistent with the policy of protecting the interests of insured parties. *See McCall*, 310 S.E.2d at 515. In cases involving a tower of multiple insurers, the policyholder is unaffected by the policy tier in which a claim settles, as long as it settles within the policies' combined limits. Requiring an offer to be within an individual insurer's limits would dramatically narrow the scope of insurers' duties to settle, reducing primary carriers' incentives to tender their limits and thereby discouraging settlement.

For these reasons, the $3 million and $5 million demands during trial, which were within the insured parties' combined limits, were enough to trigger a duty for

Liberty in the *Wells* case. This duty required Liberty to act reasonably, measured by the standard of the ordinarily prudent insurer. *Fortner*, 686 S.E.2d at 95.[4]

2. *The failure-to-settle claim here does not require an excess judgment.*

Liberty's next argument is that an excess judgment was necessary for liability on American Guarantee's failure-to-settle-claim. As this issue bears on the district court's conclusions of law, we review it de novo. *See Sidman*, 841 F.3d at 1201.

In *Delancy*, we observed that Georgia law was ambiguous as to whether a judgment in excess of the insured's policy limits is necessary to bring a failure-to-settle claim. *Delancy*, 947 F.2d at 1551. As we noted, Georgia courts have enabled insured parties to recover when faced with excess judgments. *Id.* (citing *Shaw v. Caldwell*, 189 S.E.2d 684, 687 (Ga. 1972)). But we identified no cases requiring an excess judgment as a necessary element of a failure-to-settle claim. *Id.* at 1551–52. Therefore, we assumed that an insured party may prevail on such a claim even without an excess judgment. *Id.* at 1552.

In support of its argument, Liberty cites several cases issued after our decision in *Delancy*. These cases state that an insurer can be liable for an excess judgment

---

[4] Liberty also objects to the district court's description of the scope of its duty. In its order, the district court wrote that "Liberty had a duty to do all that it could to avoid trial." We recognize that Liberty's duty was not unlimited. *See Brightman*, 580 S.E.2d at 522 (rejecting "an affirmative duty on the [insurance] company to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits"). In context, however, we read the district court's description as identifying, as a factual matter, what Liberty's duty to act like a reasonably prudent insurer required under the circumstances: "It had a duty to tender its limits and remove itself from the negotiations to allow the next insurer up the chain to take over settlement discussions."

25

against its insured. *E.g.*, *Brightman*, 580 S.E.2d at 521; *Fortner*, 686 S.E.2d at 94; *Baker*, 747 S.E.2d at 6; *S. Gen. Ins. Co. v. Wellstar Health Sys., Inc.*, 726 S.E.2d 488, 491 n.9 (Ga. Ct. App. 2012). But none of the post-*Delancy* opinions that Liberty cites hold that an excess judgment is a necessary element of a failure-to-settle claim. *See id.* And in an opinion that predates *Delancy*, the Court of Appeals of Georgia upheld a primary insurer's liability for failing to settle a claim against its insured even where no judgment was entered in excess of the insured's total policy limits. *See Home Ins. Co. v. N. River Ins. Co.*, 385 S.E.2d 736, 737–40 (Ga. Ct. App. 1989). Accordingly, we conclude that Georgia law does not require an excess judgment in this case.

3. *The district court's findings of proximate cause were not clearly erroneous.*

Liberty contends that its actions were not the proximate cause of American Guarantee's injuries. Under Georgia law, this issue is primarily a question of fact. *See Ontario Sewing Mach. Co., Ltd. v. Smith*, 572 S.E.2d 533, 536 (Ga. 2002). Accordingly, we review for clear error. *See Renteria-Marin*, 537 F.3d at 1324.

As we have noted, a failure-to-settle claim requires evidence of proximate cause. *See Delancy*, 947 F.2d at 1547. This evidence must demonstrate a sufficient causal connection between the injury asserted and the actions of the defendant insurer. *See Mayor & Aldermen of City of Savannah v. Herrera*, 808 S.E.2d 416, 423 (Ga. Ct. App. 2017).

The district court's opinion following the bench trial did not explicitly analyze proximate cause. But in its later order denying Liberty's motion to alter or amend its judgment, the court noted that its "findings on causation [were] implicit" in that earlier opinion. The court cited portions of the earlier opinion with the following findings: (1) Liberty's restrictions on the use of its $1 million prevented ACE from negotiating a high-low agreement at trial; (2) Liberty's insistence on these restrictions hindered settlement discussions between ACE and Wells; and (3) Liberty foresaw a significant verdict in excess of its own limit.

We conclude that substantial evidence supports these findings. As the district court found, Liberty kept ACE from using more than $500,000 of its limit towards the low figure of a "high-low agreement." Adjusters from Liberty and ACE both acknowledged in their depositions that these high-low brackets serve to facilitate settlement. Indeed, ACE's adjuster further stated that Liberty's restriction kept it from negotiating with Wells's counsel over his high-low demand during jury deliberations. This record supports the district court's finding that Liberty's actions kept ACE from reaching a settlement.

Liberty provides three reasons to reject this conclusion, but none is persuasive. First, Liberty challenges the district court's finding of foreseeability. According to Liberty, proximate cause requires evidence that the insurers foresaw a judgment in excess of $33 million, the insured parties' total policy limits. But Liberty overstates

27

the foreseeability requirement under Georgia law.  While we have observed that entry of an excess judgment is likely to be the "most telling evidence of foreseeable damage," *Delancy*, 947 F.2d at 1552, Georgia law does not require that the insurers anticipated a judgment above $33 million.  *See* Ga. Code Ann. § 51-12-9 ("Damages which are the legal and natural result of the act done, though contingent to some extent, are not too remote to be recovered.").  It was enough that Liberty foresaw a significant adverse verdict, as the district court found.

Furthermore, the record contains substantial evidence for this finding.  As the district court recounted in its order on the bench trial, defense counsel in the *Wells* case alerted Liberty and its insured parties to the "substantial risk" that their trial strategy would inflame the jury, possibly leading to a verdict "well in excess" of the projected range of $1.25 million to $1.5 million.  This evidence supports the finding that the damages in this case were sufficiently foreseeable.

Second, Liberty contends that the district court was required to analyze proximate cause explicitly.  But it cites for this proposition cases applying Florida law.  *See, e.g.*, *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 903–04 (Fla. 2010).  Even if Liberty accurately states Florida law, Georgia law does not impose this kind of requirement.  *See City of Savannah*, 808 S.E.2d at 423.

Third, Liberty argues that ACE's failure to settle the *Wells* case was the intervening and superseding cause of American Guarantee's damages.  To displace

28

Liberty's actions as the sole proximate cause of these damages, ACE's conduct needed to be (1) unforeseeable, (2) not a result of Liberty's actions, and (3) a sufficient cause of American Guarantee's injuries. *See Ontario Sewing*, 572 S.E.2d at 536. But Liberty fails on the second prong of this test. The district court found that Liberty's actions impeded ACE's settlement discussions with Wells, and Liberty has not shown that this finding was clearly erroneous. As noted above, the record contains substantial evidence that Liberty's restriction on the use of its $1 million prevented settlement in the *Wells* case.[5]

In sum, Georgia law accords significant deference to the factfinder on this issue. *See id.* Given the evidence in the record, we must uphold the district court's findings that bear on proximate cause. *See Fischer*, 508 F.3d at 592.

B. Liberty was not entitled to a safe harbor for offering its limits towards settlement.

The district court held that Liberty was not entitled to a safe harbor for insurers that tender their limits, *see Brightman*, 580 S.E.2d at 522, because it did not do so unconditionally. Liberty argues that the district court erred in this holding. This issue presents a legal question, *see id.*, which we review de novo, *see Sidman*, 841 F.3d at 1201.

---

[5] Liberty also refers to an $11 million settlement demand that ACE failed to accept after the jury returned a verdict. However, we note that the district court did not include this demand among its findings of fact. While there is some evidence of this demand in the record, it was not clearly erroneous for the district court to find that it did not happen.

29

Under Georgia law, an insurer that receives a settlement demand involving multiple insurers is entitled to a safe harbor from liability by "meeting the portion of the demand over which it has control, thus doing what it can to effectuate the settlement of the claims against its insured." *Brightman*, 580 S.E.2d at 522. But the safe harbor is not available when the insurer responds to a settlement demand by attaching conditions within its own control. *See Fortner*, 686 S.E.2d at 95. In that case, the finder of fact must determine whether the additional conditions are reasonable, judged by the standard of the ordinarily prudent insurer. *See id.*

As we have noted, Liberty restricted the use of its $1 million limit; ACE could not use more than $500,000 of that total towards the low end of a high-low agreement. These conditions were fully within Liberty's own control. And despite Liberty's argument to the contrary, it makes no difference that Liberty had already offered its limits with this condition by the time of Wells's $3 million and $5 million settlement demands. Indeed, the record shows that Liberty doubled down on these conditions during the week of trial, after Wells issued his demands. On the last day of trial, Liberty's adjuster in attendance sought internal approval for their entire limit to be used in reaching a high-low agreement. He explained to his colleague, "If closings go today I don't want to impede a high low settlement." But he did not receive approval; he emailed defense counsel soon thereafter, emphasizing that the full $1 million could be used for settlement purposes only.

30

Because Liberty did not tender its limits unconditionally, it was not entitled to the safe harbor as a matter of law. Instead, it was for the district court, sitting as the finder of fact, to determine whether Liberty's condition on the use of its limits was reasonable. *See id.*[6]

C. <u>American Guarantee was entitled to proceed under equitable subrogation.</u>

Liberty's final argument is that American Guarantee cannot prevail under the doctrine of equitable subrogation. Citing our decision in *Evanston Insurance Co. v. Stonewall Surplus Lines Insurance Co.*, 111 F.3d 852, Liberty contends that American Guarantee's claim fails as a matter of law because their mutual insureds could not succeed on it. We review this issue de novo. *See Sidman*, 841 F.3d at 1201.

*Evanston* involved a failure-to-settle claim between two of several insurers for a trucking company that had been sued after an accident. *Evanston*, 111 F.3d at 854, 857. Evanston, an excess insurer, sued Stonewall, a lower-level excess insurer, for failing to settle claims against the trucking company. *Id.* At trial in the underlying litigation, counsel for the trucking company and its primary insurer evaluated the claims at over $3 million, and Stonewall's counsel assessed their value at closer to $2 million. *Id.* at 855–56. The jury ultimately returned a verdict for

---

[6] Liberty does not challenge the district court's finding that Liberty's condition on the use of its $1 million limit was unreasonable.

$23.2 million, which the district court set aside. *Id.* at 857. The parties reached a settlement for $7.5 million before the conclusion of the second trial. *Id.*

Ultimately, we held that Evanston could not recover its $2.5 million settlement contribution from Stonewall. *See id.* at 857, 859–60. Under the doctrine of equitable subrogation, an excess insurer like Evanston stands in the shoes of its insured. *Id.* at 859–60. Because the trucking company had, through its counsel, actively participated in the case and failed to complain of its handling, the trucking company would not have been able to succeed in these claims against Stonewall. *See id.* As a result, we held that Evanston could not succeed on them, either. *Id.* at 860.

Liberty argues that *Evanston* controls this case because no party evaluated the *Wells* claim as exceeding Liberty and ACE's combined limits. We disagree. Unlike in *Evanston*, one of the insured parties in this case, WSE, retained separate counsel and expressed its disagreement with Liberty's handling of the litigation on more than one occasion. In particular, WSE's attorney sent a letter to defense counsel on January 7, 2015, demanding that the case be settled and noting the possibility of a "substantial verdict." According to this letter, WSE anticipated a verdict far higher

32

than Wells's settlement offers.  Because of the different facts in this case, *Evanston* does not control.[7]

Furthermore, contrary to Liberty's argument in its reply brief, *Evanston* did not require a judgment in excess of the trucking company's total policy limits, which were over $100 million.  *See id.* at 855, 858–60.  So the absence of a judgment over $33 million—the combined policy limits here—is not fatal for American Guarantee's claim.

## IV.

For the reasons set forth in this opinion, we affirm the district court's entry of judgment in favor of American Guarantee.

**AFFIRMED.**

---

[7] Liberty notes that after WSE sent its January 7, 2015, letter, it offered its limits towards settlement.  But as we have noted, that offer was not an unconditional tender necessary to secure the safe harbor under Georgia law.  Therefore, it was for the finder of fact to determine whether Liberty satisfied its duty of acting as an ordinarily prudent insurer.