[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-10926

Non-Argument Calendar

_____

MATTHEW J. HERSH,
JOSEPH CARTER,

Plaintiffs-Appellants,

*versus*

UNITED STATES OF AMERICA,

Defendant,

CAVACHE, INC.,
a Florida profit corporation,

2                 Opinion of the Court              20-10926

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:17-cv-14212-JEM

_____

Before BRANCH, BRASHER, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiffs Matthew J. Hersh and Joseph Carter brought this action following an alleged allision between their boat and a dredge pipe owned by Defendant Cavache, Inc., that occurred during a nighttime transit of the Indian River near Sebastian, Florida. Plaintiffs claim Defendant violated safety rules and regulations governing operation of submerged pipelines and was negligent in allowing the dredge pipe, which typically is moored to the bottom, to rise to the surface. Following a bench trial, the district court found Plaintiffs' testimony, and that of their supporting fact witnesses, not credible and concluded that Plaintiffs failed to submit sufficient credible evidence to carry their burden of proving Defendant's negligence. After careful review, we find the district court's findings regarding Defendant's alleged violations of safety rules and guidelines governing operation of submerged pipelines lack sufficient

specificity and remand the case for further fact-finding regarding Defendant's alleged negligence.

## I.    BACKGROUND

### A.    Factual Background[1]

On June 9, 2015, Defendant was engaged in a project to dredge parts of the Atlantic Intracoastal Waterway, including an area around the Sebastian Inlet.  For the project, Defendant laid plastic dredge pipe to transport dredge material.  Most of the pipeline was submerged and held to the bottom with weights.

Defendant marked the general direction of the pipeline with buoys and markers and placed lights on the dredge and floating portions of the dredge pipeline.  Defendant also placed signs at local docks and boat ramps notifying boaters that dredging was in process and advising the use of caution when transiting the Intracoastal Waterway and Sebastian Inlet.  The United States Coast Guard also issued Local Notices to Mariners advising boaters of the dredging, urging mariners to "maintain a safe distance from the dredge to avoid potential interference with the pipeline," and cautioning them to "transit the area at their slowest safe speed to minimize wake and proceed with caution after passing arrangement have been made."

---

[1] Unless otherwise noted, we set forth the facts based on the findings made by the district court after a bench trial. We accept the district court's factual findings unless they are clearly erroneous. *Pictet Overseas Inc. v. Helvetia Tr.*, 905 F.3d 1183, 1185 n.1 (11th Cir. 2018).

Plaintiffs assert that they left New Port Richey, Florida, on the evening of June 8, 2015, and drove across the state to night fish in the Sebastian Inlet. After launching their small power boat and fishing for a few hours, Plaintiffs claim they struck Defendant's dredge pipe during their return to the dock while moving at 16 to 20 miles an hour. Plaintiffs claim the accident occurred at approximately 3:15 to 3:45 a.m. on the morning of June 9, 2015. However, Plaintiffs did not report the incident to anyone until after they returned to their hometown four days later. At that time, they sought medical treatment for injuries allegedly caused by the allision.

### B.    Procedural History

Plaintiffs filed this action claiming Defendant was negligent under general maritime law, among other claims no longer relevant. Defendant denied negligence and disputed whether the alleged allision ever occurred, much less in the manner Plaintiffs claimed.

The district court held a bench trial on Plaintiffs' negligence claims. Plaintiffs both testified regarding their trip to fish Sebastian Inlet at night, the circumstances of the alleged allision, and their activities following the allision. In particular, they testified that Defendant's dredge pipe was not lit, they did not see the pipe before hitting it, but that they did observe the pipe floating at the surface when looking back after the allision. Plaintiffs also described how they returned to the site of the allision later that morning, but no pipe was visible in the water.

To buttress their claim that Defendant's dredge pipe was floating in the early hours of June 9, 2015, Plaintiffs called Frederick Marks and Nivaldo Veliz, who also claimed to hit a dredge pipe at the location of Plaintiffs' alleged allision. Like Plaintiffs, Marks and Veliz live in New Port Richey, Florida, and work in the construction industry. However, they maintained they did not know each other at the time of the alleged allision. Plaintiffs assert they learned of Marks and Veliz and their mishap through Leonard Cako nearly four years after the accident. Plaintiffs have a personal and professional relationship with Cako. Cako owns a professional install company and is a project manager for a general construction company. He testified that he had hired Plaintiffs as subcontractors on a project, that his contracts were breached as a result of Plaintiffs being unable to work following the allision, and that he is owed money for the breach. In what he describes as a "total coincidence," Cako also testified that a couple of months before trial a subcontractor informed him that "[m]y cousin has a friend of his that hit the pipe at the Sebastian Inlet June 15th." Explaining his reaction, Cako testified, "I'm like, 'There's no way, it's impossible.'" Cako subsequently met with Veliz and Marks, asked about their fishing trip, and told Plaintiff Hersh about what he had found out. He also began hiring Marks for construction jobs following their meeting.

When called at trial, Marks and Veliz described a fishing trip to Sebastian Inlet nearly identical to Plaintiffs' trip. They testified that they too traversed the state on June 8, 2015 to fish the

Sebastian Inlet at night.  Marks and Veliz further testified that they also struck a floating pipe in the location described by Plaintiffs while returning to the dock at 1:30 a.m. on June 9th, a couple of hours before Plaintiffs' alleged allision.  However, neither reported the allision.

In addition to those fact witnesses, Plaintiffs called Captain Sam Stephenson as an expert in boating and navigation.  He opined regarding the lighting of the dredge pipeline and the manner in which Plaintiffs' operated their boat.  In particular, Captain Stephenson testified that a dredge pipeline shown in one of Defendant's promotional videos was not lighted in compliance with safety requirements imposed by the federal statutes and regulations.  He also opined that Plaintiffs operated their boat at a safe speed and maintained a proper look-out.

Finally, Plaintiffs interrogated Anthony Cavo, a part owner of Defendant.  Mr. Cavo described Defendant's dredging operation, including the installation and maintenance of its dredging pipes.  In particular, Plaintiffs questioned Mr. Cavo regarding the circumstances in which Defendant's dredge pipes could float and its compliance with safety requirements imposed by the Corps of Engineers.

Defendant countered with its own marine forensics expert, Kyle McAvoy.  He testified that there was no physical evidence to substantiate Plaintiffs' claim that they allided with Defendant's pipeline.  He also testified that the speed of Plaintiffs' boat at the time of the collision was not safe for the conditions.  McAvoy also

opined that there was no evidence presented that the approved standard for marking the dredge pipe for the dredging project was not maintained.

In addition, Defendant presented testimony from Paul Alber, an expert in forensic analysis of GPS units. He opined regarding inconsistencies between the data on Plaintiffs' GPS device and the testimony Plaintiffs offered regarding their whereabouts during their trip.

Defendant also called as a witness Officer Caleb Hallsten of the Florida Fish and Wildlife Conservation Commission. He testified regarding the many obstructions in the area traversed by Plaintiffs and the difficulty in safely navigating those waters at night. He also recounted his effort to investigate the claim made by Plaintiffs, which they reported to his agency six days after the alleged allision. His boat accident report described the "accident-type" as "struck underwater object" and stated that "operator inattention" contributed to the accident.

Following witness testimony, the parties submitted written closing arguments and proposed findings of fact and conclusions of law. On February 12, 2020, the district court issued its Findings of Fact and Conclusions of Law and a Final Judgment.

### 1.    The District Court's Findings of Fact

Defendant's dredging project consisted of approximately six (6) miles of high-density twenty-four-inch diameter plastic dredge pipe primarily on the west side of the ICW. Defendant marked and

lit the pipeline in compliance with its contractual requirements, guidelines issued by the Army Corps of Engineers, and federal statute. Most of the pipeline was submerged. Defendant marked submerged portions of the pipeline with buoys and markers. Submerged pipeline was held to the bay bottom by the weight of the water and dredge material, as well as large steel collars weighing approximately 250 pounds each that were welded around the pipeline approximately every twenty-five feet. The pipeline was also anchored to the bay bottom at regular intervals to avoid any lateral movement.

Boaters were alerted to the dangers presented by the dredging operations. Defendant placed signs at all of the docks and boat ramps in the area notifying boaters that dredging was in process, and advising the use of caution when transiting the ICW and Sebastian Inlet. The United States Coast Guard ("USCG") also issued Local Notices to Mariners before and during the project, advising boaters that dredging was in progress in the ICW and Sebastian Inlet. Those notices urged mariners to "maintain a safe distance from the dredge to avoid potential interference with the pipeline." They also advised mariners to "transit the area at their slowest safe speed to minimize wake and proceed with caution after passing arrangements have been made."

Plaintiffs claim to have made their way from New Port Richey, Florida, to Sebastian, Florida on June 8, 2015, at around 8:00 p.m. They arrived in Sebastian between 11:00 p.m. and 12:00 a.m., with Hersh's boat in tow. Plaintiffs did not have a reservation

20-10926                Opinion of the Court                    9

for the evening and purportedly planned to night fish in the Sebastian Inlet and then stay on the boat while docked at Sportsman's Lodge & Marina ("Sportsman's") until check-in the following day. Upon arriving at Sportsman's, Hersh climbed into the boat to plot a GPS waypoint to ensure they could find the dock at night. The Plaintiffs then proceeded to a nearby public boat ramp, where they launched the vessel. Both Plaintiffs admitted seeing Defendant's sign (or a similar one) at the boat ramp advising boaters that dredging was in progress in the ICW and Sebastian Inlet and to exercise caution.

Plaintiffs testified that neither had operated a boat in the area before June 8, 2015. Plaintiffs also admitted that neither of them checked the Local Notice to Mariners before launching the boat around midnight in Indian River on June 8, 2015. Plaintiffs had only briefly looked at the relevant chart in the days leading up to the trip.[2]

Plaintiff Hersh was an avid night fisher. His boat was equipped with a GPS, a depth finder, and paper charts. To navigate from the public boat launch to the Sebastian Inlet, Plaintiffs took an "inside route" along the coast. Plaintiffs admitted to seeing Defendant's dredge barge, booster-barges, tow/work boats, markers, buoys, floats, lights, etc. on the voyage out to Sebastian Inlet.

---

[2] Plaintiffs' own navigation expert Captain Stephenson testified that briefly glancing over navigation charts before leaving New Port Richey was not prudent.

Based on Plaintiffs' testimony, the court found Plaintiffs: (1) were generally unfamiliar with the area, though both were somewhat familiar with night fishing; (2) failed to take reasonable steps to familiarize themselves with the area and/or possible obstructions to navigation they may encounter boating in the area; (3) were actually aware of the dredging operations in the area upon their arrival; and (4) had been warned to use caution even prior to launching their boat.

Plaintiffs fished the Sebastian Inlet until approximately 2:30–3:00 a.m. when they decided to return to Sportsman's to dock for the remainder of the morning. Because Hersh was fatigued from work, driving and trailering the boat across the state, and operating the boat while fishing, it was decided that Carter would operate the boat on the return voyage while Hersh served as a lookout.[3] Hersh used a spotlight to aid navigation. Rather than following the same path back to the public dock at idle speed and then proceeding a little further south to Sportsman's, the Plaintiffs ran the vessel at a speed of approximately twenty-five miles per hour south in the ICW.

Carter testified that when Plaintiffs had finished fishing, he hit the "direct" button on the GPS to navigate the boat to the

---

[3] Plaintiffs' navigation expert, Captain Stephenson, testified that he would not have allowed someone as fatigued as Hersh to act as his lookout nor Carter to act as an operator if there were other, more rested individuals available. Captain Stephenson also testified, however, that Plaintiffs were operating at a safe speed and maintained a proper lookout.

20-10926              Opinion of the Court              11

waypoint Hersh allegedly created in the GPS at Sportsman's dock. Carter stated that the GPS unit created a navigation path for the vessel from their current position just west of the Sebastian Inlet through navigable channels rather than a straight line from their present position to Sportsman's waypoint. To clarify the seeming improbability of that testimony, Hersh stated that while fishing, he had input a number of waypoints along the intended return route within the navigable channels that the GPS then used to return to Sportsman's.[4]

Plaintiffs testified to having passed Defendant's dredge barge, booster barges, tow and work boats, markers, buoys, floats, and lights, which were described as lit up "like Christmas trees," on their return voyage. At Day Marker 68, Carter turned west toward the shore. Plaintiffs spotlighted a white marker ball on the left-hand side as they approached Marker 68 and, after turning, Hersh spotlighted the no-wake zone sign near the private channel and the reflectors of channel markings. Although the exact timing of Carter's actions was in dispute at trial, it was generally agreed that Plaintiffs turned out of the ICW on a plane and traveled approximately 300 feet before allegedly striking a dredge pipe at sixteen to twenty miles per hour. Carter claims to not have seen the dredge pipe prior to the allision, but after pointing the spotlight behind the

---

[4] Although Plaintiffs' Answers to Interrogatories indicated that waypoint 8 was Navigation Marker 62, GPS expert Alber testified that the same was created on August 2, 2014—ten months prior to the incident and marked a position in the Gulf of Mexico ten miles west of Tarpon Springs.

boat post-allision, it was "clear as daylight" that there was a dredge pipe "floating" or "bobbing." The accident allegedly occurred at approximately 3:15 to 3:45 in the morning.

After hitting the pipe, Plaintiffs claim to have idled in and along the shore back to Sportsman's. The Plaintiffs noticed "a little bit of water coming in" and some "spider cracking" of the fiberglass. Plaintiffs claimed the accident caused the vessel to be holed in the bottom and taking on water, yet they slept on the vessel that very night and took the boat back out on the water the next morning to the area where they hit the pipe. There was no pipe to be seen. The pipe was no longer floating as they claimed it was the night before. Plaintiffs' theory is that because the pipe was being flushed that morning starting at 7:00 a.m. until about 10:00 a.m., there was no longer enough sediment to hold the pipe down, causing it to bob in and out of the water at the time of the alleged accident.[5]

After providing this general background of the alleged incident, the district court made credibility findings. The court found

---

[5] The district court took issue with this theory for various reasons. First, the court observed that no flushing operations were alleged to have occurred in the middle of the night, which is the time when Plaintiffs purportedly struck the pipe. Rather, as indicated in Defendant's quality control report, the flushing occurred on June 9, 2015 at around 7:00 a.m. Plaintiffs' alleged accident would have occurred about four hours prior to such flushing. Additionally, it would seem more likely that the pipe would be floating at around noon, which was when the Plaintiffs arrived back at the spot of the accident and two hours after the flushing concluded. Yet, no pipe was floating then.

"there is significant evidence that the incident may not have occurred at all, or at the very least, did not occur as the Plaintiffs allege. The court offered several reasons for deeming Plaintiffs' testimony not credible. First, Hersh's bank statement contains two charges at the Flying J gas station—one for gas and one for the attached convenience store—on June 9, 2015, which is around the time Plaintiffs claim to have launched the vessel in Sebastian. The Flying J gas station is in San Antonio, Florida, which is on the west coast, yet Plaintiffs claim to have been on the east coast of Florida at that time. While Hersh testified that perhaps his significant other visited the gas station and made the charges while Plaintiffs were in Sebastian, the bank statement clearly evidences that these charges were made using the same debit card that Hersh admitted to using for each and every other charge during Plaintiffs' trip to Sebastian.

Additionally, Defendant's GPS expert Paul Alber testified that according to the information he received from Hersh's GPS, the waypoint Hersh allegedly created for Sportsman's dock was actually created at 9:43 a.m. on June 9, 2015-i.e., about six hours after the alleged incident occurred.[6]

---

[6] In fact, Defendant's GPS Expert Paul Alber testified that the data recovered from Plaintiff Hersh's GPS revealed that twelve (12) new waypoints were created on his GPS after the incident off of the west coast of Florida in the five (5) months following the month of the alleged incident during the time Plaintiff Hersh testified the vessel was damaged and not operated.

Further, the district court noted that Plaintiffs' actions following the accident cast doubt on their account of the event. First, even though Plaintiffs remained at Sportsman's for three more nights and four more days after the alleged allision, they never notified any of the entities—Defendant, the United States Coast Guard, the Florida Fish & Wildlife Conservation Commission ("FWC"), or the United States Army Corp. of Engineers—that one would expect them to have contacted had the accident actually occurred. Moreover, Plaintiffs never alerted any of the above entities to the existence of a dangerous, floating pipeline, which notification is required by law. In fact, Plaintiffs failed to report the incident to anyone until after they returned to their hometown on the west coast of Florida some four days later. Officer Caleb Hallsten, the FWC Investigating Officer, testified that the Plaintiffs refused the FWC's request to allow for an inspection of the vessel after they finally reported the incident.

The district court also cited Plaintiffs' post-allision activities as being inconsistent with their testimony regarding the severity of the allision. On the date of the alleged incident, Hersh withdrew $1,009.00 and spent $217.50 at a local bar and restaurant named Captain Butchers. A mere two days after the alleged incident, and despite testifying that the Plaintiffs were too injured to fish and did not use the boat at any time after the accident, Hersh admitted to spending $137.39 to purchase tackle at a local tackle shop. That same day, Hersh spent $109.72 at Captain Hiram's (another local bar/restaurant), $300 at Captain Butchers, and $92.25 at Outriggers

Bar & Grill.  The district court found such spending on food and alcohol significantly undermined Plaintiffs' claims that they were essentially relegated to their hotel room for the remainder of their time in Sebastian following the accident.

The district court further found that on June 9, 2015, and every other day during the dredging project, the pipeline remained submerged and without any reports of floatation.  Other than Plaintiffs and their two witnesses, Marks and Veliz, there were no reports of a floating pipeline in the area.  As discussed at great length on the record, the court found witnesses Marks and Veliz "completely incredible" and gave little, if any, weight to their testimony.[7]

---

[7] In a colloquy regarding Defendant's motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c), the district court commented on Plaintiffs' case, stating "there's some real stinky testimony in this case . . . there is some very, very, strange, strange happenings in this case."  With respect to Marks, Veliz, and Cako the court noted "there's a lot of incredible stuff in their testimony."  The court characterized Marks and Veliz as "two of the worst witnesses I have ever heard."  The court noted the combativeness of Cako and his propensity for saying "totally gratuitous" things and his willingness to say whatever he thought the court wanted to hear.  Noting the financial incentives for Cako's testimony and his role in finding Marks and Veliz, the court found "that's a really stinky pie that is being cooked up."  The court further found the testimony of Plaintiffs' three fact witnesses "painful to sit . . . and listen to" and so incredible that it "torpedos [sic] [Plaintiffs'] case."  Even Plaintiffs' counsel acknowledged that he thought "Veliz was very strange" and that portions of his testimony were "bizarre to [him]" and that he said things that "made no sense to me."  The court concluded its assessment of Plaintiffs' case noting

Based on the foregoing, the district court found that Plaintiffs "failed to prove by a preponderance of the evidence that the damages they incurred during the incident—if it occurred at all—were caused by the negligence of the Defendant and not their own failure to act reasonably under the circumstances."

### 2.    The District Court's Conclusions of Law

The district court found that this case implicates two common law burden-shifting presumptions invoked when a moving vessel allides with a stationary vessel or object, i.e., the *Oregon* Rule and the *Pennsylvania* Rule. The court noted the *Oregon* Rule creates a rebuttable presumption of fault against the moving vessel that, under its own power, allides with a stationary object. *The Oregon*, 158 U.S. 186, 197 (1895). The *Pennsylvania* Rule states that when a party is in violation of a statutory rule intended to prevent an allision, "it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873). "In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *Id.*

The district court found Plaintiffs to be presumably at fault under the *Oregon* Rule because Plaintiffs' vessel was operating under its own power and Defendant's pipeline was a stationary object

_____

that, while Plaintiffs' expert and doctor were "telling what [they] believed to be the truth," "all of the factual witnesses are very difficult, very difficult."

at the time of the alleged allision.  The court further found that even without applying the *Oregon* presumption, Plaintiffs are nonetheless presumed entirely liable under the *Pennsylvania* Rule because Plaintiffs did not consult the Local Notices to Mariners and did not operate their vessel with reasonable care.  In particular, the court found that Plaintiffs failed to comply with Rules 5-6 of the U.S. Inland Navigation Rules that require vessels to proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.  After listing a number of factors for considering whether a vessel was operated at a safe speed, including night-time conditions and the proximity of navigation hazards, the court found that Plaintiff Carter was not operating the vessel as a prudent mariner would, was inattentive, and was not traveling at a safe speed at all times relevant to the alleged incident. The court also found that Plaintiffs Carter and Hersh failed to maintain a proper lookout in violation of Rule 5, based on Hersh's admitted fatigue and the Plaintiffs' expert's own testimony that he would not have allowed such a fatigued individual to act as a lookout.

The court noted that, as contemplated by the *Pennsylvania* Rule, the Navigational Rules and Local Notices to Mariners are designed to avoid potential allisions.  The court found that had Plaintiffs acted with reasonable care and in compliance with the relevant rules, the allision could have been avoided.  On this point, the court deemed the testimony of Plaintiffs' expert, Captain Stephenson,

informative. Specifically, Captain Stephenson testified that while operating his personal vessel at night he encountered a similar dredge pipe floating at the surface, but was traveling at a speed that allowed him to take evasive action to avoid the allision and any damage to his vessel or its passengers. The court reiterated that but for Plaintiff Carter's failure to operate the vessel in a prudent manner, maintain a safe speed, take into consideration the prevailing conditions, and failure to maintain a proper lookout, the allision and any damage related thereto could have been avoided. Accordingly, the court concluded that Plaintiffs failed to provide sufficient evidence to shift the burden under the *Oregon* Rule and are entirely liable for their own negligence under the *Pennsylvania* Rule.

The court rejected "Plaintiffs' counsel's argument that the totality of the coincidences presented at trial are so incredible as to render the tale credible." To the contrary, the court noted that much of the testimony presented by the Plaintiffs and their witnesses was not credible and did not satisfy Plaintiffs' burden in proving their claims asserted against Defendant. The court reiterated that "[t]he Court's findings as to the foregoing witnesses' testimony can be summed up as it was on the record at trial: "[some] of the worst witnesses [the Court has] ever heard." The court particularly noted that "the involvement of witnesses Veliz, Marks, and Cako—and their seeming financial interest in the outcome of the case—deems their testimony especially lacking in credibility."

Accordingly, the court entered judgment in favor of Defendant.

## II.    DISCUSSION

Plaintiffs appeal the district court's judgment for Defendant. They argue that its determinations that Defendant was not negligent in allowing its dredge pipe to float and that Plaintiffs negligently operated their vessel rest on erroneous factual findings. Plaintiffs also argue that the district court erroneously found Defendant in compliance with safety rules and consequently failed to shift the burden of proof as to causation to Defendant as required by the *Pennsylvania* Rule.

### A.    Standard of Review

"We review the court's conclusions of law *de novo*." *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007). "The district court's findings of fact—including determinations of the credibility of witnesses and weight of the evidence—will not be set aside unless they are clearly erroneous." *Id.*; *see* Fed. R. Civ. P. 52(a). "A finding of fact is clearly erroneous when the entirety of the evidence leads the reviewing court to a definite and firm conviction that a mistake has been committed." *Dresdner Bank AG v. M/V Olympia Voyager*, 446 F.3d 1377, 1380 (11th Cir. 2006) (citation omitted). "In a case in which the evidence is largely testimonial, like this one, the district court has the advantage of observing the witnesses and evaluating their credibility firsthand, and the standard of review imposes an especially heavy burden on an

appellant." *Fischer*, 508 F.3d at 592 (internal quotations omitted). Thus, our review of the district court's decision is "highly deferential." *Renteria–Marin v. Ag–Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citation omitted). However, "[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020) (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982)).

"We must also review findings of fact and conclusions of law to ensure that they satisfy Federal Rule of Civil Procedure 52(a)(1)." *Id.* "That rule requires that a district court 'find the facts specially and state its conclusions of law separately.' Fed. R. Civ. P. 52(a)(1)." *Id.* "We will vacate and remand a judgment resulting from a bench trial where 'the findings of the district court do not provide a sufficiently definite predicate for proper appellate review.'" *Id.* (quoting *Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.*, 520 F.2d 1030, 1034 (5th Cir. 1975)).

B.    The District Court's Findings Regarding Defendant's Alleged Negligence Lack Sufficient Specificity to Permit Proper Appellate Review

As argued at trial, this case presents two primary issues: (1) whether an allision between Plaintiffs' boat and a floating dredge pipe actually occurred; and (2) if it did, whether Defendant's negligence contributed to the allision. Although the district court ruled for Defendant, we find the basis for that decision unclear and not sufficiently supported by detailed findings, as further explained below.

1.    The District Court Failed to Determine Whether an Allision Occurred

As to the first issue, the district court did not make an express finding as to whether an allision occurred. Instead, the district court made credibility findings adverse to Plaintiffs and stated that "there is significant evidence that the incident may not have occurred at all, or at the very least, did not occur as the Plaintiffs allege."

The district court offered several reasons for its dim view of Plaintiffs' credibility. For example, Plaintiffs' testimony regarding their whereabouts did not align with GPS data. Debit card charges on Plaintiff Hersh's bank statement also reflected that Plaintiffs were on the west coast, not the east coast, of Florida at relevant times. Defendant's GPS expert testified that GPS waypoints Plaintiffs cited as evidence supporting their story were created after the

alleged allision. Plaintiff also testified that the accident caused the vessel to be holed in the bottom and take on water, yet they slept on the vessel after the allision and, on the next morning, took the boat back out on the water to the area where they allegedly hit the pipe. Moreover, Plaintiffs inexplicably failed to report the alleged allision during their stay on the east coast, instead waiting until they returned home four days later, at which point they declined the FWC Investigating Officer's request to inspect the boat, indicating that this would require their attorney's approval, an approval that apparently was never given.

The district court also noted that Plaintiffs testified they were too injured to fish and did not use the boat after the accident. However, Plaintiff Hersh purchased $137.39 of tackle shortly after the accident and Plaintiffs frequented local bars and restaurants, undermining their claim that they were essentially relegated to their hotel room for the remainder of their time in Sebastian following the accident.

The district court made further findings rejecting evidence and testimony Plaintiffs introduced to buttress their testimony that an allision occurred. For instance, the district court afforded little, if any, weight to the testimony from Marks and Veliz that they too traveled to Sebastian, Florida, to fish on the same night as Plaintiffs and also hit a floating dredge pipe. The court deemed Marks and Veliz as "[some] of the worst witnesses [the Court has] ever heard" and entirely uncredible. Notably absent from Plaintiffs' appeal is any attempt to demonstrate the district court erred in rejecting

their testimony as not credible.  Moreover, that Plaintiffs appeared to have suborned testimony that the district court clearly believed to be perjurious further undermined Plaintiffs' credibility.

While questioning the credibility of testimony by Plaintiffs and their witnesses that they observed a floating pipeline on the morning of the accident, the district court also made factual findings consistent with an inference that Defendant's dredge pipe had remained submerged at the time Plaintiffs claimed that it was floating and that they hit it.  For instance, the court found that "[m]ost of the pipeline was submerged and held to the bay bottom by the weight of the water and dredge material, as well as large steel collars weighing approximately 250 pounds each, which were welded around the pipeline approximately every twenty-five feet."  The district court further took issue with Plaintiffs' theory that Defendant flushed the dredge pipe of sediment on the morning of the incident causing it to float, noting that Defendant's quality control report indicated the flushing occurred at around 7:00 a.m., which was hours after the alleged allision.

Nevertheless, despite this clear expression of its skepticism that the accident described by Plaintiffs had even occurred,[8] the district court stopped short of making an express finding to this effect.

---

[8]  It should be noted that Plaintiffs dispute the factual basis for some of the district court's observations discounting the credibility of Plaintiffs' account. As the court never made a firm finding as to whether the allision actually occurred, we need not delve into those objections by Plaintiffs.

Had the district court made such a finding, Plaintiffs would bear an especially heavy burden of demonstrating otherwise as we afford the district court's credibility determinations great deference. *Fischer*, 508 F.3d at 592. But the district court did not do so. Instead, the court proceeded to evaluate Plaintiffs' claims under the assumption that an allision had occurred, and it ruled against Plaintiffs based on its determination that the latter had acted negligently. The lack of a specific finding that the allision did not occur means that we may affirm the court's holding that Plaintiffs were solely at fault only if the district court properly assessed Defendant's alleged contributory negligence.

> 2. <u>The District Court's Findings Lack the Specificity Required to Hold that Defendant's Negligence Did Not Contribute to the Allision</u>

Assuming, as we must for purposes of this appeal, that an allision occurred, we next review the district court's assessment of liability. Allocation of liability for the allision implicates the *Oregon* and *Pennsylvania* Rules.

> a. The *Oregon* and *Pennsylvania* Rules

Plaintiffs argue that the district court misapplied the *Oregon* and *Pennsylvania* rules. The *Oregon* and *Pennsylvania* Rules are "common law burden-shifting presumptions invoked when a moving vessel allides with a stationary vessel." *Superior Const. Co., Inc. v. Brock*, 445 F.3d 1334, 1339 (11th Cir. 2006). "[T]he *Oregon* Rule creates a rebuttable presumption of fault against a moving

20-10926                Opinion of the Court                25

vessel that, under its own power, allides with a stationary object."
*Id.* (citing *The Oregon*, 158 U.S. 186, 197 (1895). "This presump-
tion of negligence may be rebutted by showing, by a preponder-
ance of the evidence, either that the allision was the fault of the
stationary object, that the moving vessel acted with reasonable
care, or that the allision was an unavoidable accident." *Id.* at 1339–
40 (quoting *Bunge Corp. v. Freeport Marine Repair*, 240 F.3d 919,
923 (11th Cir. 2001).

"[U]nder the Pennsylvania Rule, 'when . . . a ship at the time
of a[n allision] is in actual violation of a statutory rule intended to
prevent [allisions], it is no more than a reasonable presumption that
the fault, if not the sole cause, was at least a contributory cause of
the disaster. In such a case the burden rests upon the ship of show-
ing not merely that her fault might not have been one of the causes,
or that it probably was not, but that it could not have been.'" *Id.*
(quoting *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136 (1873)).
"The *Pennsylvania* Rule 'is not a rule of liability, but shifts the bur-
den of proof as to causation. This burden is strict, but it is not in-
surmountable.'" *Id.* (quoting *Orange Beach Water, Sewer, & Fire
Prot. Auth. v. M/V Alva*, 680 F.2d 1374, 1381 (11th Cir. 1982) (cita-
tions omitted)).

The parties do not dispute that the *Oregon* and *Pennsylva-
nia* Rules are settled law. Instead, they dispute how those rules
should apply here. Defendant contends that because Plaintiffs'
boat, moving under its own power, allegedly allided with its sta-
tionary dredge pipe, the *Oregon* Rule should apply to Plaintiffs.

Plaintiffs assert that the *Pennsylvania* Rule should apply to Defendant because it violated rules and regulations governing the installation and marking of its dredge pipe that are designed to prevent allisions.

In cases like this one, "the burden of proof initially rests with the moving vessel under the *Oregon* Rule.  If the moving vessel can establish the stationary vessel violated a statutory rule intended to prevent allisions, however, then the *Pennsylvania* Rule shifts the burden to the stationary vessel." *Id.*  That holds true unless the moving vessel also violated statutes designed to prevent allisions. "When both vessels involved in the allision are operating in violation of statutes designed to prevent such mishaps, the [*Pennsylvania*] rule requires 'the district court to find that the statutory fault of both vessels contributed to the accident, unless it [finds] that the fault of either . . . could not have been a cause of the [allision].'" *Id.* (quoting *Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591, 594 (11th Cir. 1986) (quoting *Otto Candies, Inc. v. MV Madeline D,* 721 F.2d 1034, 1036 (5th Cir.1983))).  "In other words, if each vessel successfully invokes the *Pennsylvania* Rule against its opponent, then each vessel must overcome a presumption of fault by showing its violation could not have been a cause of the allision." *Id.*

Here, the district court concluded that "Plaintiffs failed to provide sufficient evidence to shift the burden under the *Oregon* Rule and are entirely liable for their own negligence under the *Pennsylvania* Rule."  The Court further concluded that "Plaintiffs

have entirely failed to submit *credible* evidence to carry their burden to establish their claims of negligence against the Defendant." In so concluding, however, the district court made no specific ruling on whether Plaintiff established violations of statutes, regulations, or applicable safety provisions by Defendant that would subject Defendant to the *Pennsylvania* Rule and require Defendant to overcome a presumption of fault that it contributed to the allision. That omission requires a remand, as further explained below.

> b.    The District Court's Findings Lack the Specificity Required to Hold that Defendant Complied with all the Rules and Regulations Governing Its Dredging Operations

Plaintiffs contend that Defendant's violation of safety rules led, at least in part, to the allision and therefore the district court should have applied the *Pennsylvania* Rule to Defendant. Plaintiffs maintain that: (1) Defendant's floating dredge pipe obstructed navigation in violation of 33 U.S.C. § 409; (2) Defendant did not comply with the lighting requirements of 33 CFR 88.15; (3) Defendant violated safety requirements imposed by the United States Army Corps of Engineers – Safety and Health Requirements Manual which expressly addresses safety requirements (e.g., anchoring, marking, lighting) for submerged dredge pipelines like the one Plaintiffs claim to have hit. Violation of any of these provisions could trigger application of the *Pennsylvania* rule against Defendant, and Defendant does not contend otherwise. *See Orange*

*Beach*, 680 F.2d at 1383 ("The failure to comply with a permit issued by the Corps triggers the application of the rule of The Pennsylvania."). But the district court did not expressly address the alleged violations.

The district court made a general and conclusory finding that "[w]here the pipeline was submerged Defendant marked the general direction of the pipeline with buoys and markers . . . in compliance with its obligations." But the court failed to specifically address the precise requirements of the allegedly violated provisions of federal code, federal regulations, and the Army Corps of Engineers Safety Manual, much less evaluate Plaintiffs' evidence that Defendant violated these provisions. The district court's general finding regarding compliant marking of the pipeline, which cites no evidence of record and does not address the precise requirements imposed for submerged pipelines, is insufficient to allow appellate review of the alleged specific violations raised by Plaintiff.

Indeed, several of the cited provisions require Defendant to keep its pipeline submerged to avoid obstructing navigation. *See* 33 U.S.C. § 409; Corps Safety Manual Section 19.G.03(a) and (c). Yet, while questioning whether an allision in fact occurred, the district court did not make any findings that the pipeline in question remained submerged at all times on the morning of the allision. We note that, while generally addressing Defendant's practice of anchoring "most of the pipeline [that] was submerged" with 250-pound steel collars, the district court did not make any express

findings that the specific pipe allegedly hit by Plaintiffs was submerged with steel collars or that 250-pound steel collars were sufficient to keep the relevant pipeline submerged at all times. Nor did the court make specific findings as to the condition or state of the relevant pipeline on the morning of the allision.

As for whether the submerged pipeline floated to the surface on the morning of the allision, the district court did state, as previously noted, that it "takes issue" with Plaintiffs' theory that flushing the pipeline of sediment caused it to rise at the time of the allision. Yet, the district court took issue only with the timing of the flushing operation, identifying testimony suggesting it occurred after the alleged allision. The court did not take issue with Plaintiffs' argument that flushing sediment from the pipeline could cause the pipeline to rise to the surface in violation of the cited provisions. Moreover, we question whether the record supports the district court's assessment of the timing of the flushing operation. Defendant's quality control report merely states that flushing occurred "this morning for 3 hours" and did not specify an exact time. Further, Mr. Cavo did not know what time the pipe was flushed on the morning of the incident, testifying only generally that the "dredging operation" itself "should have been . . . seven a.m. to seven p.m." In any event, the district court's questioning of Plaintiffs' theory of how Defendant's submerged pipeline could rise to the surface at the time of the alleged allision falls short of the affirmative and detailed findings necessary to support a conclusion that Defendant complied with all applicable safety provisions, including

those that prohibit the pipeline from fluctuating between the water surface and the channel bottom or lying partially submerged.

The district court's findings regarding the condition of the pipeline in question are not detailed enough to comply with Federal Rule of Civil Procedure 52 or to permit appellate review of Plaintiffs' contention that Defendant violated numerous statutes, regulations, and safety provisions in allowing its submerged pipeline to surface and their contention that those violations contributed to the alleged allision. "A court's failure to 'to state [findings of fact] with sufficient detail to indicate the factual basis for [the] ultimate conclusions of law' requires us to vacate the judgment and remand for a new bench trial because it renders appellate review 'practically impossible.'" *Compulife Software*, 959 F.3d at 1308–09 (quoting *Ionmar Compania Naviera, S. A. v. Olin Corp.*, 666 F.2d 897, 903 (Former 5th Cir. 1982) (Tjoflat, J.)).

Vacatur of the judgment and remand is therefore necessary here. We are not in a position to rule in the first instance whether Defendant's pipeline floated to the surface or to attempt a comprehensive analysis of the alleged safety violations of Defendant from scratch as "[w]e are, after all, a court of review, not a court of first view." *Callahan v. United States Dep't of Health & Human Servs. through Alex M. Azar II*, 939 F.3d 1251, 1266 (11th Cir. 2019).

In light of these considerations, on remand the district court should provide specific findings addressing the following questions: (1) did Plaintiffs establish by a preponderance of the evidence that an allision actually occurred between Plaintiffs' boat and

Defendant's pipeline; (2) if an allision occurred, did Defendant violate any relevant rules governing its operations such that Defendant would be subject to the *Pennsylvania* rule; (3) if Plaintiffs established a rules violation by Defendant, did Defendant carry its burden of proving that its violation could not have been a contributory cause of the allision; and (4) if Defendant's rules violation contributed to the allision, how should fault be allocated. These "findings must be specifically detailed to give an appellate court a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts." *Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1549 (11th Cir. 1987) (quotation omitted). Once these findings have been articulated, the district court should then indicate the legal conclusions that it draws as a result of the findings.

In remanding this case, we express no opinion as to whether Defendant's submerged pipeline floated to the surface or whether the alleged allision even occurred. Nor do we opine as to whether Defendant violated a relevant safety rule or whether any rules violation contributed to the alleged allision. We merely state that a finding that Plaintiffs violated safety rules and negligently operated their boat does not necessarily absolve Defendant of liability if Defendant's violation of a rule designed to prevent allisions contributed to the accident. *See Self*, 832 F.2d at 1549 ("The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied." (quotation omitted)).

## III.    CONCLUSION

For the reasons explained above, we **VACATE** the judgment and **REMAND** this case to the district court for proceedings consistent with this opinion.